******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARY H. KORTNER, ADMINISTRATRIX (ESTATE
OF CAROLINE KENDALL KORTNER)
*v.* CRAIG L. MARTISE
(SC 18793)

Rogers, C. J., and Norcott, Palmer, Zarella, Eveleigh, McDonald and
Vertefeuille, Js.*

*Argued March 13, 2013—officially released June 10, 2014*

*Christopher C. Burdett*, for the appellant-appellee
(plaintiff).

*Philip Russell*, with whom, on the brief, was *Steven Hartong*, certified legal intern, for the appellee-appellant (defendant).

*Royal J. Stark* and *Jean M. Aranha* filed a brief for Connecticut Legal Services, Inc., as amicus curiae.

*Daniel J. Klau* filed a brief for the Connecticut Probate Assembly et al. as amici curiae.

*Kirk W. Lowry* and *Sally Zanger* filed a brief for the Connecticut Legal Rights Project as amicus curiae.

*Sandra L. Sherlock-White*, *Alexander J. Cuda* and *Michael S. Schenker* filed a brief for the Connecticut Bar Association as amicus curiae.

*Opinion*

EVELEIGH, J. The plaintiff, Mary H. Kortner, the administratrix of the estate of her daughter, Caroline Kendall Kortner (Kendall),[1] appeals from the judgment of the trial court, rendered after a jury trial, in favor of the defendant, Craig L. Martise.[2] On appeal, the plaintiff claims that the trial court improperly denied her motion to set aside the verdict and for a new trial because a document that was not properly admitted into evidence mistakenly was given to the jury during its deliberations and had the potential to have a highly prejudicial impact on the jury. For the reasons stated in this opinion, we agree with the plaintiff and, accordingly, reverse the judgment of the trial court. We address the plaintiff's additional claim that the trial court improperly denied her motion to strike and motion in limine regarding Kendall's ability to consent to sexual conduct and the defendant's claims, raised in his cross appeal,[3] that the trial court improperly instructed the jury to consider Kendall's status as a conserved person when determining her capacity to consent to sexual conduct, and that the trial court improperly submitted interrogatories asking the jury to determine whether the defendant showed Kendall pornographic photographs and videos, because these issues are likely to arise again on remand and are adequately briefed.[4] We answer these additional questions in the negative.

The record reveals the following facts, which the jury reasonably could have found, and the following procedural history. Kendall was born on July 21, 1970. Throughout her life, Kendall struggled with a severe eating disorder and other psychological issues, which required repeated hospitalizations. During her lifetime, she was diagnosed with clinical depression, borderline personality disorder, obsessive compulsive disorder, anorexia nervosa, bulimia nervosa, and periodic dystonia and catatonia. In 1994, at the recommendation of one of the physicians treating Kendall for her eating disorder, the plaintiff filed the initial application to be appointed as the conservator of Kendall's person. The court granted the plaintiff's application on the ground that Kendall was unable to manage her own affairs.[5]

In 1999, Kendall was living in an apartment in Stamford. She received the help of an aide, who attended to her on a daily basis, and oversight from the plaintiff. One of Kendall's treating physicians arranged for Kendall to receive a computer and instruction on how to use it in an effort to enrich her life. At that time, Kendall began reading Internet sites for women suffering from eating disorders and posted a profile on the Internet indicating that she was interested in helping people deal with eating disorders. The profile also indicated where Kendall lived.

Shortly thereafter, Kendall received her first instant

message, which was from the defendant. Kendall did not know the defendant at the time, but in the message he explained that he had dated a girl with an eating disorder while in college and that he was curious about them. The defendant only identified himself by his first name. Kendall did not respond at first. Then, the defendant proceeded to send approximately ten more instant messages to Kendall. After these additional messages, Kendall responded and they began communicating by instant messages.

The defendant was a computer programmer, and he helped Kendall learn how to use her computer. The relationship between Kendall and the defendant continued exclusively online for several years. During this time, Kendall revealed details of her life to the defendant, including the sexual abuse she had suffered as a child and in college, her psychological problems, her many hospitalizations for her eating disorder and the fact that the plaintiff had been appointed as her conservator. They never exchanged last names, never spoke on the telephone and never met in person. Their only form of communication was by e-mail and instant messages. During this time, Kendall was not aware that the defendant was married and had four children.

In May, 2001, Kendall suffered a stroke, which resulted in a lengthy hospitalization, during which she suffered failure of multiple organs and underwent numerous medical procedures. After her hospitalization, she underwent extensive physical therapy and rehabilitation. After the stroke, Kendall suffered some paralysis, which affected, among other things, her ability to walk without the use of a walker or other device.

In late November, 2002, after the plaintiff had begun transitioning back to her apartment, Kendall reconnected with the defendant and they began to communicate by e-mail and instant messages again. Sometime in late December, 2002, the defendant and Kendall began talking on the telephone.

After several requests by the defendant, in February, 2003, the defendant and Kendall met for the first time at her apartment. At first, the defendant and Kendall developed a platonic relationship—the defendant helped her with the computer, and they would watch movies and talk. Eventually, their relationship became sexual and developed into a sadomasochistic sexual relationship.

In August, 2003, the plaintiff became aware of Kendall's sexual relationship with the defendant when she noticed a change in Kendall's behavior and saw bruising on her body. The plaintiff then made an appointment for Kendall to see her physician and psychiatrist. At the advice of her physician, Kendall discontinued the relationship with the defendant. Thereafter, Kendall filed a complaint with the Stamford Police Department.

In 2006, the plaintiff, as conservator of the person of Kendall, filed a three count complaint against the defendant, which was subsequently amended, alleging that the defendant committed sexual battery, civil assault and intentional infliction of emotional distress. The plaintiff sought compensatory and punitive damages.

The matter was tried to a jury over ten days in December, 2009. The jury returned a verdict for the defendant on all three counts of the complaint. Thereafter, the plaintiff filed a motion in arrest of judgment, to set aside the verdict and for a new trial on the ground that a document identified as "plaintiff's exhibit 7" had been improperly sent to the jury, despite never being admitted into evidence at trial. The trial court denied the plaintiff's motion and rendered judgment in accordance with the verdict. The plaintiff appealed and the defendant cross appealed.[6]

I

We begin with the threshold jurisdictional question of whether the plaintiff, as conservator of Kendall's person, had standing to bring the present action in which damages were sought for alleged intentional torts committed against Kendall by the defendant.[7] The plaintiff asserts that she had standing to bring the present action as conservator of the person of Kendall under General Statutes §§ 45a-650 and 45a-656 as they existed at the time this action was brought in 2006. Specifically, the plaintiff asserts that, under the prior versions of §§ 45a-650 and 45a-656, the powers and duties of the conservator were unlimited except when the order appointing the conservator limited them, and that the order appointing the plaintiff as Kendall's conservator in the present case contained no limitation. The defendant asserts that the plaintiff did not have standing to bring the present claim because the powers of a conservator are limited and the conservatorship in the present case did not grant the plaintiff the authority to bring a claim on Kendall's behalf. We conclude that, even assuming, arguendo, that the plaintiff did not have standing to bring this action in 2006, any defect was cured when she was substituted as administratrix of Kendall's estate pursuant to General Statutes § 52-109.

With respect to the applicable legal principles, we have explained that "[s]tanding is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy." (Internal quotation marks omitted.) *Wilcox* v. *Webster Ins.*, Inc., 294 Conn. 206, 214, 982 A.2d 1053 (2009).

Nevertheless, "[s]tanding is not a technical rule

intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) *Canty* v. *Otto*, 304 Conn. 546, 556, 41 A.3d 280 (2012). "These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy." (Internal quotation marks omitted.) *Pond View, LLC* v. *Planning & Zoning Commission*, 288 Conn. 143, 155, 953 A.2d 1 (2008). "Standing [however] requires no more than a colorable claim of injury . . . ." (Internal quotation marks omitted.) *Electrical Contractors, Inc.* v. *Dept. of Education*, 303 Conn. 402, 411, 35 A.3d 188 (2012).

Even if we were to assume, arguendo, that the plaintiff did not have standing to bring the action when it was commenced in 2006, any jurisdictional defect was cured by her substitution as plaintiff in 2010 pursuant to § 52-109.

In 2010, after Kendall passed away and the plaintiff had been appointed administratrix of her estate, the plaintiff sought substitution pursuant to § 52-109. On April 23, 2010, the trial court granted substitution of the plaintiff as administratrix of Kendall's estate as the plaintiff in this matter.

Section 52-109 provides as follows: "When any action has been commenced in the name of the wrong person as plaintiff, the court may, if satisfied that it was so commenced through mistake, and that it is necessary for the determination of the real matter in dispute so to do, allow any other person to be substituted or added as plaintiff."

In *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 297 Conn. 105, 150, 998 A.2d 730 (2010), this court explained that "[o]ur rules of practice . . . permit the substitution of parties as the interests of justice require. . . . These rules are to be construed so as to alter the harsh and inefficient result that attached to the mispleading of parties at common law. . . . [Section] 52-109 and [what is now] Practice Book § [9-20] allow a substituted plaintiff to enter a case [w]hen any action has been commenced in the name of the wrong person as plaintiff . . . . Both rules, of necessity, relate back to and correct, retroactively, any defect in a prior pleading concerning the identity of the real party in interest." (Citation omitted; internal quotation marks omitted.)

This court also recognized that our rules regarding substitution of parties are analogous to the federal rules and that federal courts have observed "that [when] the change is made on the plaintiff's side to supply an indispensable party or to correct a mistake in ascertaining the real party in interest, in order to pursue effectively the original claim, the defendant will rarely be unfairly prejudiced by letting the amendment relate back to the original pleading. . . . As long as [the] defendant is fully apprised of a claim arising from specified conduct and has prepared to defend the action, his ability to protect himself will not be prejudicially affected if a new plaintiff is added . . . . Thus, an amendment substituting a new plaintiff [will] relate back if the added plaintiff is the real party in interest." (Citation omitted; internal quotation marks omitted.) Id., 150–51.

"[R]emedial statutes such as [§ 52-109] were intended to soften the otherwise harsh consequences of strict construction under the common law: Over-technical formal requirements have ever been a problem of the common law, leading [legislative bodies] at periodic intervals to enact statutes . . . [that], in substance, told the courts to be reasonable in their search for technical perfection. . . . Under § 52-109, substitution is permitted only when the trial court determines that the action was commenced in the name of the wrong plaintiff through mistake, which properly has been interpreted to mean an honest conviction, entertained in good faith and not resulting from the plaintiff's own negligence that she is the proper person to commence the [action]. . . . [O]nce such a determination is made . . . the substituted party is let in to carry on a pending suit, and is not regarded as commencing a new one. After he is substituted he is . . . treated and regarded for most purposes just as if he had commenced the suit originally. The writ, the complaint, the service of process, attachment made, bonds given, the entry of the case in court, the pleadings if need be, in short all things done in the case by or in favor of the original plaintiff . . . remain for the benefit of the plaintiff who succeeds him, as if done by and for him originally and just as if no change of parties had been made. So far as the defendant is concerned, the same suit upon the same cause of action, under the same complaint and pleadings substantially in most cases, goes forward to its final and legitimate conclusion as if no change had been made." (Citations omitted; internal quotation marks omitted.) Id., 151–52.

Indeed, in *DiLieto*, this court also favorably cited a federal case, *Health Research Group* v. *Kennedy*, 82 F.R.D. 21, 30 (D.D.C. 1979), for the proposition that the substitution of a real party in interest as the plaintiff cures the lack of standing of the original plaintiff. *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 297 Conn. 151.

The relevant provision of our rules of practice is set forth in Practice Book § 9-20, which provides: "When any action has been commenced in the name of the wrong person as plaintiff, the judicial authority may, if satisfied that it was so commenced through mistake and that it is necessary for the determination of the real matter in dispute so to do, allow any other person to be substituted or added as plaintiff." To quote the commentary to this rule in the Connecticut Practice Series: "This section prevents the failure of an action when the wrong person is named as plaintiff. If a motion is granted to substitute the correct plaintiff, the motion relates back to commencement of the suit. [*Federal Deposit Ins. Corp.*] v. *Retirement Management Group, Inc.*, 31 Conn. App. 80, 623 A.2d 517 (1993)." W. Horton & K. Knox, 1 Connecticut Practice Series: Connecticut Superior Court Civil Rules (2013–2014 Ed.) § 9-20, p. 488. The commentary continues: "This section applies to the assignee when the assignor improperly brought the action, [as in] *United States Trust Co.* [*of New York*] v. *DiGhello*, 179 Conn. 246, [247 n.1, 425 A.2d 1287] (1979), or to an assignor when the assignee improperly brought the action, [as in] *Bowen* v. *National Life* [*Assn.*], 63 Conn. 460, 474–77, [27 A. 1059] (1893). *Bowen* is especially important because it allowed the substitution of the correct plaintiff after the statute of limitations has run." 1 W. Horton & K. Knox, supra, § 9-20, p. 489.

On the basis of the foregoing, we conclude that even assuming, arguendo, that the plaintiff did not have standing to bring the claim when she commenced the action in 2006, any defect was cured when she, as administratrix of Kendall's estate, was substituted as the plaintiff in 2010 and that substitution related back to the commencement of the action. Our conclusion is not meant to suggest that any person who is appointed an administrator of an estate becomes a proper party to any claim. As § 52-109 requires, the substitution of an administrator of an estate "is necessary for the determination of the real matter in dispute . . . ." In the present case, it is clear that Kendall herself had "a colorable claim of injury," therefore, the substitution of the plaintiff, as administratrix of the estate, cured any possible jurisdictional defect. See *Electrical Contractors, Inc.* v. *Dept. of Education*, supra, 303 Conn. 411. Accordingly, we conclude that there are no jurisdictional defects created by standing in the present case.

II

We next turn to the plaintiff's claim that the trial court improperly denied her motion to set aside the verdict and for a new trial. Specifically, the plaintiff asserts that the trial court abused its discretion by denying her motion after becoming aware of the misconduct that infected the trial process. Namely, the plaintiff asserts that the trial court clerk's failure to alert the

court of a question from the jury regarding a particular exhibit constituted misconduct in the trial process requiring reversal. We agree with the plaintiff.

The record reveals the following additional facts and procedural history, which are relevant to the plaintiff's claim. Prior to the trial in this case, the trial court and counsel for both parties agreed that the parties would premark each exhibit and exchange copies of each exhibit. It was agreed that if the parties could not agree on the admissibility of an exhibit, it would be marked for identification purposes only. If all counsel agreed on an exhibit, it would be marked as a full exhibit. The parties agreed that the clerk who was overseeing the marking of exhibits would fill out the exhibit sheet listing each of the exhibits and indicate whether it was a full exhibit or for identification purposes only. On November 20, 2009, counsel for both parties and the clerk met, marked and exchanged exhibits. On the same day, the clerk marked "plaintiff's exhibit 7" as a full exhibit.

Plaintiff's exhibit 7 is a typewritten letter dated February 15, 2003. The letter is addressed to the XYZ Housing Authority at 482 West Main Street in Stamford. This letter states as follows: "I have been a disabled resident of 482 West Main Street for seven years. Events over the past two years have forced me to bring a matter of serious concern to your attention to be addressed. Please be advised by this letter that I expect these concerns to be rectified immediately or I will take further action in other forums.

"Specifically, one of your employees John Jones . . . for the past two years has consistently made unwanted, inappropriate and threatening sexual advances to me. For example:

"Unwanted and [i]nappropriate sexual behavior including, but not limited to, hugging, attempted kissing, getting into bed with me without my consent, inappropriate touching, conversing in a sexual nature, and generally behaving in both actions and deeds in a manner that makes me uncomfortable and feeling extremely threatened and sexually abused.

"Threatening behavior including, but not limited to, constantly visiting and loitering around my front door and in my apartment, constantly telling me how he wants to 'get together with me', not leaving when I ask him to leave, sitting in the chair by my bed for extended periods of time (for no reason), telling/threatening me that 'he'll be back' and generally acting in words and deeds in a manner that makes me feel vulnerable, defenseless and that my safety is in extreme jeopardy.

"If any of these actions persist in any way from this point forward, for my own safety I will be forced to address these concerns with higher authorities in both the civil and criminal forums; as well as getting other

bodies (i.e. [s]tate, [f]ederal, [m]edicare, [Better Business Bureau], etc.) to deal with them as severely as they should be treated.

"Lastly, to avoid further harassment, I expect all future communications in this matter be addressed either in writing or with both my mother and I present.

"Sincerely, Kendall Kortner." (Emphasis omitted.)

Although the plaintiff has consistently alleged that the document was drafted by the defendant, no testimony or other evidence regarding the source or nature of the document was ever presented to the jury.

Prior to the start of trial, the plaintiff had filed a motion in limine seeking to prohibit the defendant from presenting evidence regarding Jones. After hearing argument on the motion in limine, the trial court ruled that the defendant was not to inquire into that issue without first alerting the court of his intention to do so, but reserved its decision on the admissibility of such evidence to be made based on the testimony at the time of trial. Plaintiff's exhibit 7 had been marked as an exhibit prior to the court making a final ruling on the motion in limine during trial. Thereafter, during trial, the trial court ultimately ruled that "[t]here will be no questions regarding [Jones]."

During the trial in this matter, neither counsel for the plaintiff nor counsel for the defendant ever introduced plaintiff's exhibit 7 into evidence or presented any testimony regarding that exhibit. After final arguments, the trial court instructed the jury, in relevant part, as follows: "If you have any questions, put them in writing and deliver them to the court personnel who will deliver them to the court, in other words, to me.

"Likewise if you wish to make a request to hear any of the testimony again, as you have the right to, put the request in writing and please try to be as specific as possible.

"Now I just want to tell you about these writings that come from the foreperson. When you write a note to the court and ask for either some testimony to be played back or you have a question to the court, that should be in writing, and the foreperson should sign the note, okay, with his name and the date and time that you are making the request to the court, so you'll be very specific in that respect."

Thereafter, counsel for both parties reviewed the documents provided to the jury for their deliberation, and confirmed the submission of all exhibits to the jury, including plaintiff's exhibit 7. Neither counsel for the plaintiff nor counsel for the defendant informed the court that plaintiff's exhibit 7 should be removed from the exhibits based on the trial court's ruling during trial.

After the jury's verdict had been read and accepted and court was adjourned, the trial court met with the

jury to thank them for their service. At that time, one of the jurors mentioned plaintiff's exhibit 7 and expressed confusion about the fact that he had not heard about it during trial. The trial court did not offer an explanation of the exhibit, but stated that it had been marked as a full exhibit. The trial court excused the jurors and told them they were permitted to speak with anyone about their service, including counsel, but not to speak about their deliberations.

Thereafter, the plaintiff filed a motion to set aside the verdict and for a new trial. The plaintiff submitted two affidavits from jurors as part of her motion, including one affidavit from the foreperson. In one of these affidavits, a juror explained that he was confused about plaintiff's exhibit 7 during deliberations and that the jury "discussed whether to send a general question to the judge asking about the exhibits we were supposed to have during our deliberations, or whether to send a note specifically about [p]laintiff's [e]xhibit 7." The affidavit continues, "[e]ventually, the foreperson prepared a note specifically about [p]laintiff's [e]xhibit 7, and we sent for the clerk." The juror further explained, "[w]e then showed the clerk [p]laintiff's [e]xhibit 7 and said that it was what we were concerned about, and the clerk replied that she was familiar with it and that it was supposed to be a part of the evidence we should consider." The affidavit also states: "We asked whether our question about [p]laintiff's [e]xhibit 7 needed to be answered by the court, but we believed that the clerk had essentially answered the question for the court, so we accepted that answer, the foreperson discarded the note he had prepared for the judge, and we went on with our deliberations."

In another affidavit, the foreperson explained as follows: "In response to my question about sending a note to the judge, the clerk said it would not be necessary, since everything in the box of exhibits which had been brought in to us for our deliberations was supposed to be there." The affidavit further states that the foreperson recalled "asking a couple of times, and the clerk seemed quite confident that it was unnecessary to alert the judge." The foreperson also indicated in his affidavit that he "had actually written a quick note to the judge, which [he thought] several of the other jurors saw, inquiring about this exhibit, but because of the clerk's comments, we did not forward the note to the judge."

As the ground for her motion set aside the verdict and for a new trial, the plaintiff claimed that because it was not offered or admitted into evidence during trial, plaintiff's exhibit 7 was not properly submitted to the jury pursuant to Practice Book § 16-15 and that, had the jury's written question about plaintiff's exhibit 7 been submitted to the trial court, the court would have made further inquiry and had the ability to withdraw it and issue a curative instruction. The plaintiff further

claimed that the potential harmfulness and prejudice of plaintiff's exhibit 7 is both highly significant and self-evident because the jury never heard testimony identifying or explaining the document and the nature of the document went to a central issue in the case, namely, Kendall's ability to resist unwelcome sexual advances.

The trial court denied the plaintiff's motion. In doing so, the trial court relied on the fact that the plaintiff's counsel reviewed the exhibits that were submitted to the jury prior to their submission and that neither plaintiff's counsel nor defendant's counsel objected to the submission of plaintiff's exhibit 7 to the jury. In denying the plaintiff's motion, the trial court also relied on the fact that the plaintiff had not demonstrated that the jury was affected by the exhibit.[8] The trial court also rejected the plaintiff's claim that the clerk's failure to allow the jury to present a note to the court was not itself reason to set aside the verdict and grant a new trial. Furthermore, the trial court concluded that "the exhibit at issue was introduced and [premarked] by the plaintiff as a full exhibit. This marking was made even though it was clear that the parties had the right to mark any exhibits which were not agreed upon as an exhibit for identification. There was never a request to correct the marking during the days of trial or to withdraw the exhibit as a full exhibit. More importantly, as the exhibits were prepared for submission to the jury for consideration in the deliberation, the plaintiff specifically noted plaintiff's exh[ibit] 7 as a document to be submitted to the jury. These actions by the [plaintiff] can lead to no other conclusion than that [she] waived any objection to the submission of the exhibit to the jury."

We begin our analysis of the plaintiff's first claim by setting forth the applicable standard of review. "The proper appellate standard of review when considering the action of a trial court in granting or denying a motion to set aside a verdict is the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 303, 852 A.2d 703 (2004). "[T]he role of the trial court on a motion to set aside the jury's verdict is not to sit as [an added] juror . . . but, rather, to decide whether, viewing the evidence in the light most favorable to the prevailing party, the jury could reasonably have reached the verdict that it did." (Internal quotation marks omitted.) *Hunt* v. *Prior*, 236 Conn. 421, 429 n.21, 673 A.2d 514 (1996). "In reviewing the action of the trial court in denying [or granting a motion] . . . to set aside the verdict, our primary concern is to

determine whether the court abused its discretion . . . . The trial court's decision is significant because the trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to [the] evidence. Moreover, the trial judge can gauge the tenor of the trial, as [this court], on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury." (Internal quotation marks omitted.) *Childs* v. *Bainer*, 235 Conn. 107, 113, 663 A.2d 398 (1995).

On appeal, the plaintiff asserts that the trial court improperly denied her motion to set aside the verdict and for a new trial. Specifically, the plaintiff asserts that, the submission of plaintiff's exhibit 7 to the jury for consideration constitutes juror misconduct because it was not admitted into evidence and it is highly likely that it prejudiced the jury because the jurors never heard any testimony explaining the document and the document addressed an issue central to the plaintiff's case, namely Kendall's ability to resist unwelcome sexual advances. The plaintiff also asserts that she did not waive any objections to the admission of the document and was improperly denied the opportunity to ask the trial court to rectify the mistake. In response, the defendant asserts that the trial court did not abuse its discretion in denying the plaintiff's motion to set aside the verdict. Specifically, the defendant claims that plaintiff's exhibit 7 was properly before the jury because it was marked by the plaintiff as a full exhibit prior to trial. The defendant further asserts that the plaintiff waived any claim that plaintiff's exhibit 7 was improperly submitted to the jury. The defendant also claims that, even if plaintiff's exhibit 7 was improperly provided to the jury, the plaintiff did not meet her burden of establishing that she was entitled to a new trial. We agree with the plaintiff.

A

We first address the threshold issue raised by the plaintiff's claim—namely, whether plaintiff's exhibit 7 was evidence in the case. The plaintiff asserts that plaintiff's exhibit 7 was not evidence in the case because it was never offered or received in evidence during the course of the trial and that the premarking of that document as a full exhibit did not make it evidence in the trial. The defendant claims that plaintiff's exhibit 7 was properly before the jury because the parties had marked it as a full exhibit prior to trial. We agree with the plaintiff.

The text of Practice Book § 5-7 supports the conclusion that exhibits must be received in evidence during the course of the trial. Specifically, § 5-7 provides as follows: "Unless otherwise ordered by the judicial authority, the clerk shall mark all exhibits not marked in advance of trial and shall keep a list of all exhibits

marked for identification or received in evidence *during the course of the trial*." (Emphasis added.) As § 5-7 indicates, a document can only be received in evidence during trial and the clerk must maintain a list of documents received in evidence during the trial.

The defendant asserts that plaintiff's exhibit 7 was admitted into evidence because it was premarked as a full exhibit prior to trial. The procedure for premarking exhibits is explained in the Civil Jury Trial Management Order (trial management order), a standing order of the Judicial Branch. See B. Quinn & L. Lager, "Civil Jury Trial Management Order," (last modified March 11, 2011), p. 2, available at http://jud.ct.gov/external/super/Standorders/Civil/_TMC_Order_Jury.pdf (last visited May 22, 2014). This order explains as follows: "Before the start of evidence, all exhibits each side *reasonably expects to introduce* must be [premarked] as full . . . if all sides agree, or for identification only . . . . Unless otherwise ordered by the court at the trial management conference or by the assigned trial judge, exhibits shall be marked in accordance with the instructions contained in Form JD-CL-28 (List of Exhibits) and the form must be submitted to the court on or before the first day of evidence. Any exhibit that is offered at trial but is not on the List of Exhibits will not be admitted, except for good cause shown or if the exhibit is offered as rebuttal or impeachment evidence." (Emphasis added.) Id. The language of the trial management order specifically indicates that, at trial, a party must still introduce an exhibit that has been premarked as a full exhibit. Indeed, the premarking of an exhibit as full only indicates that a party "reasonably expects to introduce" it as an exhibit and, if it is offered, the other party will not object. Id. Nothing in these orders or the Practice Book suggests that the premarking of an exhibit replaces the actual offering of an exhibit into evidence at trial. Furthermore, the language of the order specifically contemplates that the marking of an exhibit as full does not require that the exhibit necessarily be used as evidence during the trial.

Indeed, during the course of this trial, counsel for the plaintiff and counsel for the defendant and the judge all operated with the understanding that documents that were premarked as full exhibits still needed to be offered into evidence during the course of the trial. For instance, at trial, when counsel for the plaintiff attempted to ask the plaintiff about a document that had been premarked as a full exhibit, counsel for the defendant interrupted saying, "[i]f Your Honor please, I don't know if the document has been offered or not at this point." The trial court then responded, "[h]as not. Are you offering that as a full exhibit, counsel?" Counsel for the plaintiff responded as follows: "Well it was marked as a full exhibit before, but at this point I'll withdraw the offer and we'll deal with it when we can do it in a logical fashion." This colloquy makes

clear that counsel for both parties and the judge in the present case understood that the premarking of a document as a full exhibit did not constitute offering that document into evidence.

On the basis of the foregoing, we conclude that plaintiff's exhibit 7 was not properly admitted into evidence. Plaintiff's exhibit 7 was never received into evidence by the judge and never published to the jury. It is undisputed that plaintiff's exhibit 7 was only premarked as a full exhibit, was never mentioned during the course of the trial and was never shown to the judge or the jurors during the course of the trial. Therefore, we conclude that it was not properly received into evidence and should not have been given to the jury pursuant to Practice Book § 16-5.

The defendant asserts that the plaintiff waived any claim related to plaintiff's exhibit 7 because she requested that it be marked as a full exhibit prior to trial and never asked that it be removed from the exhibits that were provided to the jury for their deliberation. We disagree.

The defendant claims that the plaintiff waived her claim regarding plaintiff's exhibit 7 because she affirmatively premarked the exhibit as a full exhibit. As we explained previously herein, the plaintiff did not offer plaintiff's exhibit 7 into evidence at trial, but merely asked that it be placed on the list of exhibits that she reasonably expected to introduce at trial, in accordance with the trial management order. A review of the trial management order, however, reveals that "all exhibits each side reasonably expects to introduce must be premarked as full . . . if all sides agree . . . ." B. Quinn & L. Lager, supra, p. 2. Therefore, the plaintiff's decision to mark plaintiff's exhibit 7 as a full exhibit for the exhibit list is not grounds to find that she waived any later claim about that document.

Moreover, it is important to remember that at the time the plaintiff asked that plaintiff's exhibit 7 be marked as a full exhibit, the trial court had not ruled on the plaintiff's motion in limine seeking to exclude evidence related to Jones. Once the trial court ruled on the plaintiff's motion in limine and determined that evidence related to Jones would not be admissible, plaintiff's exhibit 7 could not be admitted into evidence in the absence of a new ruling by the trial court.

The defendant also claims that the plaintiff waived any claim related to the submission of plaintiff's exhibit 7 to the jury when plaintiff's counsel had the opportunity to conduct a final review of the documents to be submitted to the jury on December 17, 2009. Although, we agree with the plaintiff's counsel's acknowledgment that he made a mistake in not asking that plaintiff's exhibit 7 be removed from the exhibits submitted to the jury, we cannot conclude that this mistake constitutes

waiver or induced error. The plaintiff consistently took the position, through her motion in limine, that any evidence related to Jones—thereby necessarily including plaintiff's exhibit 7—should be excluded. Additionally, the plaintiff had no reason to believe that a document that was never actually offered or received into evidence during the course of trial would be included in the exhibits submitted to the jury. Based on the foregoing, we cannot conclude that any inadvertent failure on her counsel's part to object to the inclusion of plaintiff's exhibit 7 in the exhibits being submitted to the jury is sufficient to constitute waiver, especially since counsel for the defendant also had the same obligation to alert the court to any mistake in the exhibits being submitted to the jury in light of the judge's ruling that all testimony regarding Jones was inadmissible.

Furthermore, the clerk's failure to alert the judge to the jury's concerns deprived the plaintiff and the trial court of the opportunity to rectify the inadvertent mistake of providing plaintiff's exhibit 7 to the jury for deliberation. As explained previously in this opinion, the trial court instructed the jury to put any questions in writing and submit them to the clerk. The jury attempted to follow this instruction by preparing a note regarding plaintiff's exhibit 7 and calling for the clerk. According to the court's instructions, the jury understood that the clerk would deliver that note to the court. The clerk, however, did not follow the procedure as described in the instructions. Instead, the clerk took it upon himself or herself to respond to the jurors' question about plaintiff's exhibit 7 and to never alert the judge or the parties to the jurors' concerns about the exhibit. It was this interference with the trial process that prevented the trial court and the parties from having the opportunity to rectify the inadvertent error of providing plaintiff's exhibit 7 to the jury for their deliberations.[9]

A clerk must always convey a jury's question to the judge, as explained in the model jury instructions. See Connecticut Civil Jury Instructions (4th Ed. 2008) instruction 2.9-3, available at http://www.jud.ct.gov/JI/civil/part2/2.9-3.htm (last visited May 22, 2014) (copy contained in the file of this case in the Supreme Court clerk's office) ("If you have questions during your deliberations, the foreperson should write the jury's question on a sheet of paper, sign and date it, and knock on the door. The marshal will then bring the question to me, and I will respond in open court. It may take a few minutes to assemble the staff before you are brought to the courtroom to hear the response. Please try to make any questions very precise. We cannot engage in an informal dialogue, and I will respond only to the question on the paper."). The actions of the clerk in this matter tainted this process. We do not know what the judge would have done if presented with the issue during the trial. We do know, however, that the actions

of the clerk prevented the trial court from considering the matter. At oral argument before this court, the counsel for the plaintiff acknowledged that he made a mistake allowing the exhibit to go to the jury, but asserted that the mistake could have been rectified if the judge was notified of the jury's question and conducted an inquiry into the matter. We also know based on the representations made by the counsel for the defendant at oral argument that he would not have objected to removing plaintiff's exhibit 7 from the exhibits given to the jury. The clerk's action, therefore, is further ground for concluding that the plaintiff did not waive her claim regarding the improper consideration of plaintiff's exhibit 7 by the jury.

The trial court relied on cases in which this court has concluded that evidence admitted without objection is in evidence. See *State* v. *Rawls*, 198 Conn. 111, 118, 502 A.2d 374 (1985) ("[w]here hearsay evidence is admitted without objection, such evidence may be given such weight as the trier of fact deems that it is worth" [internal quotation marks omitted]). We conclude that such cases are distinguishable from the present case because, as we have explained previously in this opinion, plaintiff's exhibit 7 was never admitted into evidence. The defendant does not cite, and we cannot find, any authority for the proposition that a document, which is not properly admitted into evidence during trial, becomes evidence by being provided to the jury after the close of evidence. Therefore, we conclude that the trial court's reliance on these cases was improper.

On the basis of the foregoing, we conclude that plaintiff's exhibit 7 was not properly admitted into evidence and, therefore, was not properly before the jury.

B

Having concluded that plaintiff's exhibit 7 was not properly admitted into evidence, we must determine whether the submission of that document to the jury constitutes reversible error. In the present case, the plaintiff asserts that the jury's consideration of material not in evidence was such that it is probable that the jury was so influenced by it as to cause prejudice. Specifically, the plaintiff claims that the jury's improper consideration of plaintiff's exhibit 7 prejudiced the jury because it related to a central issue in the case, namely whether Kendall was able to consent to or resist sexual advances. We agree.

Although the parties analyze this issue as one of juror misconduct, because there is no allegation that any of the jurors acted improperly themselves and, indeed, the jurors in the present case properly followed the jury instructions, we find it more appropriate to analyze this claim as we would an evidentiary impropriety since it involved the jury considering material that was improperly before it.

We have repeatedly recognized that "an evidentiary impropriety in a civil case is harmless only if we have a fair assurance that it did not affect the jury's verdict." (Internal quotation marks omitted.) *Hayes* v. *Camel*, 283 Conn. 475, 489, 927 A.2d 880 (2007).

" 'A determination of harm requires us to evaluate the effect of the evidentiary impropriety in the context of the totality of the evidence adduced at trial. *Vasquez* v. *Rocco*, 267 Conn. 59, 72, 836 A.2d 1158 (2003). Thus, our analysis includes a review of: (1) the relationship of the improper evidence to the central issues in the case, particularly as highlighted by the parties' summations; (2) whether the trial court took any measures, such as corrective instructions, that might mitigate the effect of the evidentiary impropriety; and (3) whether the improperly admitted evidence is merely cumulative of other validly admitted testimony. . . . *Prentice* v. *Dalco Electric, Inc.*, [280 Conn. 336, 358, 907 A.2d 1204 (2006), cert. denied, 549 U.S. 1266, 127 S. Ct. 1494, 167 L. Ed. 2d 230 (2007)]; see also id., 360–61 (noting that during summation, plaintiff described issue encompassing improperly admitted scientific evidence as critical and emphasized that evidence); *Hayes* v. *Caspers, Ltd.*, 90 Conn. App. 781, 800, 881 A.2d 428 (cautionary instruction addressed prejudicial impact of expert's testimony that included arguably improper discussion of pending federal action), cert. denied, 276 Conn. 915, 888 A.2d 84 (2005); *Raudat* v. *Leary*, 88 Conn. App. 44, 52–53, 868 A.2d 120 (2005) (improperly admitted expert testimony was harmful error when it related to central issue in case, namely, condition of purchased horse); *DeMarkey* v. *Fratturo*, [80 Conn. App. 650, 656–57, 836 A.2d 1257 (2003)] (improperly admitted hearsay evidence about cause of motor vehicle accident was harmless because it was cumulative of properly admitted testimonial and diagram evidence). The overriding question is whether the trial court's improper ruling affected the jury's perception of the remaining evidence. *Swenson* v. *Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990).' . . . *Hayes* v. *Camel*, supra, 283 Conn. 489–90." *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 162–63, 971 A.2d 676 (2009).

In the present case, the plaintiff claimed that the defendant committed sexual battery, civil assault and intentional infliction of emotional distress. In response, inter alia, the defendant asserted as a special defense that Kendall consented to any and all sexual contact with him. Because of these claims and the special defense proffered by the defendant, Kendall's ability to consent or resist sexual advances was a central issue in this case. Therefore, a letter in which Kendall expressly stated her lack of consent to sexual advances and formally complained of unwanted sexual advances had the potential for significant impact on the jury. A jury

could have found that the letter itself demonstrated that Kendall had the ability to consent and was not, as the plaintiff alleged, unable to consent to sexual conduct.

An examination of the evidence adduced at trial demonstrates that the parties focused much of the testimony on Kendall's capacity to consent. The plaintiff adduced testimony to demonstrate that, despite Kendall's apparent intelligence, she was unable to care for herself and make her own decisions, including being unable to consent to sexual conduct.

For instance, Kendall herself testified that she performed very well in high school, achieving a straight A average, and then received admission to a number of top colleges. Kendall also testified that, at first, she performed very well academically in college at the University of North Carolina, Chapel Hill, but left during her sophomore year after being the victim of a gang rape. Kendall further testified that her health dramatically declined after that period and that her weight went below eighty-five pounds at that point and remained that low. Kendall testified that she became so mentally and physically challenged after that and spent most of her twenties going in and out of hospitals for treatment of her eating disorder. Kendall also explained that she received shock therapy a few times, was fed by a feeding tube against her consent and that her weight went as low as fifty-five pounds. Kendall also testified that she took a number of medications, including those for depression, anxiety, extreme pain, and a mood stabilizer. She also explained that she had a nurse or the plaintiff in each day to administer her medications and an aide to assist her with her daily tasks of living, including showering and light housework.

Kendall also testified that in May of 2001, she suffered a stroke like episode that caused a dramatic decline in her health. She explained that she was on total life support, almost had her legs amputated and underwent fasciotomies, in which they made incisions running from her ankles to her knees on the inside and outside of both legs. She also explained that after the stroke she needed to use braces and a wheelchair and learn how to eat again. Kendall further testified that she continued to have problems with her urinary function up to the time of trial, which caused her not to know when she had to urinate and that she needed to wear diapers to address this problem. Kendall also testified that she suffered mental confusion after her stroke and frequently could not think of simple words. Kendall also testified that after the stroke she needed to learn to read again.

In addition, Timothy Dolan, a detective with the Stamford Police Department who had interviewed Kendall once her relationship with the defendant was reported to the police, also testified at trial. Dolan testified that

Kendall had told him that the defendant told her to tell him to stop if anything he was doing hurt her and that she only told him to stop one time.

During cross-examination by defense counsel, Kendall testified as follows:

"Q. Did he ever say to you, '[i]f you don't want to do something or if I'm hurting you . . . then tell me to stop and I will stop?'

"A. He just did what he pleased when the time came. He said 'fire truck.' He said say 'Fire Truck,' if it gets out of hand. No matter what I said, he finished what he was doing and it was like relevant.

"Q. Right. So he ignored you when you told him to stop?

"A. Yes.

"Q. How many times—

"A. He just kept on going.

* * *

"A. He just kept going.

* * *

"Q. He just kept going?

"A. Yeah.

"Q. And he ignored you when you told him to stop?

"A. Yes."

On the other hand, the defendant testified as follows: "She never said no. She said that all the kinky fooling around stuff that we'd ever done, she said that she had a lot of lost time to make up on. And, you know, she wanted to experiment."

Furthermore, George Chapar, a psychologist who treated Kendall for many years also testified at trial. In particular, Chapar testified on direct examination by the plaintiff's counsel as follows:

"Q. [Dr.] Chapar, let me ask a very different question. Can you tell us what the psychological components are of capacity to consent to a sexual relationship?

"A. I think there are a host of elements that are important. Obviously, one has to be of an appropriate age based upon statutes that you know better than I. One has to have the cognitive ability to weigh the risks and benefits of a sexual relationship in order to make a sound judgment. One has to be able to determine, in essence, risk, whether situations are dangerous or safe to take care of oneself in that way. To have the maturity to enter into a relationship in such a way that the self is protected both physically and emotionally, and, in essence, to be mature enough to be able to take care of oneself might be an essential way to put it.

"Q. And using those standards, in your opinion, does Kendall have the psychological and developmental capacity to consent to a sexual relationship? . . .

"A. Kendall, throughout her life, since her—at least since her—since her mid-teens, has been unable to fend for herself, to assess risk and benefit, to make sound judgments, to, in essence, be able to even keep herself alive without constant intensive, both parental and professional intervention constantly.

"It's not just one disorder that she has that creates this situation, but the constellation or combination of all of the illnesses and pyschopathologies that she has now, also coupled with physical disabilities, and now in essence brain damage from the stroke, that render her unable to make independent decisions about virtually anything.

"Sexual relationships are probably one of the more complex relationships or decisions that we as people make as adults. Kendall is incompetent to make such a decision or to engage in such a relationship with any degree of safety or forethought or judgment."

On the other hand, the defendant introduced evidence tending to show Kendall's capacity to consent. Specifically, the defendant produced Reena Kapoor, a psychiatrist who evaluated Kendall at the request of the defendant for the purposes of the litigation. Kapoor testified that Kendall understood the physiological differences between males and females and what is involved in sexual intercourse. Kapoor further explained that Kendall understood that women can get pregnant and that both men and women can get sexually transmitted diseases from sexual intercourse. Kapoor acknowledged that Kendall had deficits in many areas of her general functional abilities. Nevertheless, Kapoor testified on direct examination by defense counsel as follows:

"Q. . . . Can you say with a fair degree of medical certainty, based on the evaluative criteria that you used, whether Kendall Kortner was competent to consent to sexual intercourse?

"A. Yes.

"Q. And what is your opinion?

"A. That she did have the capacity to consent at the time of this relationship."

The foregoing testimony demonstrates that the issue of Kendall's capacity to consent to a sexual relationship was central to the present case and that the testimony presented at trial did not clearly answer the question one way or the other, but had to be closely evaluated by the jury.

Moreover, an examination of the parties' summations also demonstrates that the issue of the plaintiff's capac-

ity to consent to sexual conduct during the 2003 time period was a central focus of the case. Indeed, both the plaintiff's counsel and the defendant's counsel spent a great amount of time in their summations focusing on the issue of Kendall's capacity to consent and, in particular, attempting to establish what her capacity was to consent at the time she was involved in a sexual relationship with the defendant—namely, during 2003.

The plaintiff's counsel emphasized the following evidence during his summation: "Now the issue of consent in this case, as I said, is obviously one of the critical issues. It is my position that by virtue of the fact alone, that [the plaintiff] has been "Kendall's" conservator since 1994.

"Kendall could not consent to enter into this relationship. That that is proof enough of her inability to consent to this relationship, so that's proposition number [one].

"Proposition number [two] is that as . . . Chapar told you in some detail, Kendall is incapable of consenting to a sexual relationship such as this and certainly incapable of consenting to the kind of abuse to which the defendant subjected her and . . . Chapar talked about that at some length in his testimony.

"The third proposition is that even if you conclude that Kendall has the capacity to consent . . . to such a relationship and that she did consent to any of it, the evidence is clear that in the latter part of the relationship, she stopped consenting.

"The defendant escalated the abuse to which he subjected Kendall over the entire six month period of their relationship; and you've heard evidence about that and you heard Kendall talk about it.

"It was almost like a drug addiction and he needed more and more. It became more violent. It became more aggressive. It was almost like he couldn't get the gratification he wanted without escalating the whole pattern.

"And clearly, there came a time when Kendall stopped him or tried to stop him and he kept right on going; tying her up, abusing her; hitting her with belts, burning wax on her, all the other horrible things that he did.

"Now the court will instruct you on the law and I'm not going to presume to interfere with that. The court will explain what consent means and we'll talk to you about the legal standards for consent.

"I simply suggest to you that if you look at . . . Chapar's testimony, there is simply no way you can conclude that Kendall was capable of consenting to the kind of abuse that [the defendant] subjected her to.

"Let me go back to . . . Chapar for one minute

because I think that the summary that he gave at the end of his testimony is very important for you to consider. I took it down as much as I could write it, as fast as I could write but again, it's your recollection that counts or as the Judge has already told you, you can ask to have testimony reread if you want it or played back.

"But recollection is that . . . Chapar said that for her entire life, Kendall . . . has been unable to fend for herself, to assess the risks and benefits; to make sound judgments, even to keep herself alive without constant parental and professional intervention and supervision.

"It is not just one condition but a combination of them and the brain damage caused by the history of malnutrition caused by the anorexia.

"She is pretty much unable to make sound judgments about anything. Sexual relationships are one of the most complex forms of human contact and she is unable to decide about such a relationship, any degree of safety, judgment or forethought.

"Now the defense called . . . Kapoor and obviously, she was here to refute that. She was here to say that after six hours with Kendall and after the review of some incomplete medical records, records that were current.

"Records that were missing after some standardized testing which is not controversial, and we didn't challenge it because it says what it says.

"And it was done properly and it shows that Kendall had a significant decline in her intelligence level and mental functioning between the time, certainly, that she was in college and now.

"[Kapoor] tries to suggest to you that Kendall was perfectly capable of consenting to everything that happened and that this is simply a situation where a young woman got upset because her relationship with her boyfriend broke up. [Kapoor] actually used the term 'breakup.'

"Now I will concede that . . . Kapoor's a lovely young woman. She's smart. She's successful. She's done very well in a short period of time, but I think it's important for you to remember that it is a short period of time.

"She graduated from college ten years ago. She graduated from medical school six years ago. She spent the first four years of her training doing psychodynamic therapy and treatment as a resident at the Harvard Medical School and at the Deaconess Hospital in Boston, and only in the last two years has she gone into forensic psychology at all.

"On the basis of her six hours of interviews with Kendall, the standardized testing and her review of the records that we talked about; and I remind you, by the

way, she did not interview anyone else.

"She didn't talk to . . . Chapar. She relied on his deposition transcript which was very one-sided taken by the defense, not by me. She relied on . . . [the plaintiff's] deposition transcript.

"She didn't talk to any of the medical doctors. She didn't talk to the nurses aid. She didn't talk to anybody, and yet she concluded that Kendall's perfectly capable of caring for herself and perfectly capable of consenting to the kind of treatment to which the defendant had subjected her.

"[Kapoor] told us that there were six elements to consider in determining capacity to consent to a sexual relationship like this. The patient's understanding of the nature of sexual activity, but as she readily admitted, any [twelve] year old can answer that.

"The patient's understanding of the consequences of sexual activity such as pregnancy and sexually transmitted diseases. Again, any middle school has had that taught to them in public health.

"She didn't want to talk so much about the emotional consequences of sexual activity because she hadn't really evaluated Kendall's ability to appreciate the emotional consequences.

"Then she talked about the more important factors. The patient's general functional abilities and competence in other areas, to care for herself and to communicate.

"Well the Probate Court had found [twelve] years earlier that Kendall couldn't care for herself. [Chapar] told you that Kendall's incapable of caring for herself.

"[Kortner] told you that Kendall's never been able to care for herself, at least not since she was in college, and even then she obviously had some serious problems.

"And yet on the basis of six hours of interviews and review of some of the medical records . . . Kapoor reaches the opposite conclusion. She also concludes that Kendall's got the ability to make safe choices and avoid exploitation, the ability to say no.

"Well Kendall did say no in some cases, some instances with the defendant but not very successfully.

"And then finally, she suggested that one needs to look at whether the behavior is consistent with the person's established beliefs and values; and you will remember I cross-examined . . . Kapoor about that and in point of fact, Kendall's behavior with. . . [the defendant] was the antithesis of her established beliefs and values.

"It was exactly the opposite of everything she ever believed and every value she had ever held because of the traumatic experiences she had suffered.

"[Kapoor's] analysis was based on an exam in 2009 and yet she suggests there were no differences between 2003 and 2009. That's notwithstanding six years of therapy. That's notwithstanding six years of introspection. That's notwithstanding all that's involved in bringing this lawsuit to the court.

"[Kapoor] thinks that's totally irrelevant. She did agree with . . . Chapar about the concept of psychological age, although she tried to downplay its significance and ultimately admitted that it's not something that she used in her analysis of this case.

"She did agree and I think this is really important. She did agree that Kendall is mentally handicapped. There's simply no question about that."

In his summation, the defendant's counsel emphasized the following: "So now we come to the issue of is Kendall capable of consent. Is Kendall mentally capable of consent?

"And we find out some pretty startling things about the standard or the level that people in the psychological and the psychiatric profession use to measure whether people are capable of consent.

"And notwithstanding what we learned . . . Chapar gets up here with a straight face and says [Kendall's] incapable of consent. She has the developmental age of a [twelve] year old.

"Well now here comes . . . Kapoor, and it turns out that if you have the developmental age of a [twelve] year old, guess what? If you're not [twelve] years old, you're capable of consenting to sex. Thanks, doc. For once, you two agreed on something.

"Do you know what a penis is? Do you know how it fits into a vagina? Do you know that that's where babies come from? This is the kind of functioning that makes a human being enjoy the civil privacy right that's recognized in our law to have sex with someone else.

"Are you a retarded citizen? That's not a bar to having sex. We don't sterilize people or arrest them for having sex.

"Are you mentally ill? Are you taking Zanax? Maybe you can't have sex if you're taking Zanax. I don't know but I know this. The standard for consent is very, very low.

"And the doctor who said that Kendall . . . can't make it makes things up. Hey doc, by the way, just a freebie on the way out. She reads love novels, doesn't she, romance novels? Remember them folks?

"[Dr.] Chapar, oh, yes, she reads romance novels, okay? Hey, Kendall . . . by the way, just not for nothing, do you read romance novels? No.

"If they can't get that right, how are they going to

prove life-altering damages. Now, I don't mean to be mean but we do have to be rudely realistic about this, okay? Kendall . . . is going to die of her disease and sadly, she's not going to be here in [forty] years.

"So now, the plaintiff comes in here with a table and she says, oh, this is a table that shows that Kendall . . . will live [forty] more years. No. Objection. It just says a person may live [forty] more years, okay?

"Again, stop trying to push that train through the desert. Put it on the tracks. Stop telling us what almost is. Just move it six inches, we're back onto that railroad track; and all of a sudden oh, okay, a healthy person will live until [eighty-one].

"Don't get me wrong, okay. The plaintiff really wishes that Martise brutally assaulted Kendall . . . . The plaintiff, counsel, the doctor, they all really do believe that this bad thing happened, but ladies and gentlemen, you're the jury.

"You like the people in those records, you don't have a dog in this fight and you bring to us the ability to referee this argument fairly.

"And we're not saying [the defendant is] a good guy and we're not saying you're going to like [the defendant]. In fact, I think I promised some of you that you wouldn't like him at the end of the trial.

"And I ask you if you didn't like him and you didn't like what he did and you didn't think he was a good guy, could you still do what the law requires, which is this, ladies and gentlemen.

"If they haven't convinced you that that train is six inches away from a track and that Foxwoods happened in the wintertime; and that the life expectancy table is for Kendall . . . it's not for every female in the United States in 2005.

"And if they haven't convinced you that post-traumatic stress shouldn't be in hundreds and thousands of pages generated by days and days of encounters, it can convince you that plaintiff's [exhibit] 11 — it's called plaintiff's [exhibit] 11 but it's my exhibit. [Nicholas] Kopeloff [an internist] had all those tests done but there's no treating records. If they can convince that all of that is real, if they can convince you that . . . Dolan, [the] police investigator . . . got it wrong.

"If they can convince you that she didn't consent, then yeah. I don't know what you'd do with that. Then I guess you'd have to go to damages but remember, if you believe that she consented and if you believe that . . . Dolan wrote it down because she did consent, [the defendant] told me if he's doing something I don't like, to say no, and I never said no.

"All right. Now, I don't know what you're going to do with that testimony. That's like Mount Everest.

You've got to climb over that to get to where you can talk about damages because the Judge will tell you that if you find that she consented, game's over. We go home.

"If Kendall . . . consented, if Kendall . . . was capable of consent, we're out of here. We're done. We go home. We go back to our wife and our four children and this case is over. That's the first mountain.

"Now I want to talk to you about the second mountain. The second mountain is that if you find that . . . Dolan is not reliable, if you find that . . . Dolan got it wrong.

"If you want to find that Kendall . . . didn't tell . . . Dolan on October 14 that she consented to everything that was done to her, if you want to find that, then you may consider damages."

The foregoing testimony and summations by counsel demonstrate that the issue of Kendall's capacity to consent or object to sexual conduct *during the 2003 time period* was the central issue in the case. Therefore, a written document dated after Kendall's stroke and from 2003 in which Kendall clearly expressed her lack of consent to a romantic or physical relationship with a man was very relevant to the key issue in the case. As the foregoing evidence demonstrates, the parties spent a great deal of time at trial presenting conflicting evidence about what Kendall's abilities were. The physicians who testified had conflicting opinions about her ability to consent, and one of the plaintiff's main criticisms of the testimony of the defendant's expert was that Kapoor did not interview Kendall during 2003, but her opinion was based on an interview conducted in 2009 and was not an accurate analysis of Kendall's abilities in 2003. On the basis of this debate between the experts, plaintiff's exhibit 7 served as an important document demonstrating what Kendall was able to communicate regarding consent to sexual conduct at the precise time in question. It served, essentially, as the only documentary piece of evidence from 2003 that was written by Kendall and related to her ability to consent. Indeed, we need not speculate as to whether the jury paid particular attention to plaintiff's exhibit 7 because the affidavits from the jurors and the questions to the court clerk and judge demonstrate that the jurors were taking note of the document and that it influenced their decision.[10]

Moreover, we find that the failure of the clerk to alert the judge as to the jurors' questions regarding plaintiff's exhibit 7 is significant in the present case. Specifically, the failure of the clerk to alert the judge caused the trial court not to conduct any inquiry into the alleged jury's consideration of material not in evidence. Without such a hearing, the plaintiff was unable to request any remedy. Had the trial judge been properly made aware of the jurors' concerns, the plaintiff would have had

the opportunity to request that plaintiff's exhibit 7 be removed from the jurors' consideration and that a curative instruction be given. Instead, by ignoring the jurors' concerns, the clerk prohibited the plaintiff from timely addressing the issue. Instead, the trial court required the plaintiff to prove that plaintiff's exhibit 7 probably prejudiced the jury.

As we stated previously herein, in analyzing whether a particular evidentiary impropriety is harmless, we consider the following: "(1) the relationship of the improper evidence to the central issues in the case, particularly as highlighted by the parties' summations; (2) whether the trial court took any measures, such as corrective instructions, that might mitigate the effect of the evidentiary impropriety; and (3) whether the improperly admitted evidence is merely cumulative of other validly admitted testimony. . . ." (Internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 292 Conn. 162. In the present case, all of these factors demonstrate that the evidentiary impropriety was not harmless. Plaintiff's exhibit 7 was directly related to the central issue in the case as demonstrated by the evidence and the parties' summations. The trial court did not undertake any corrective measures to mitigate the effect of the evidentiary impropriety because the clerk failed to properly relay the jurors' question to the trial court. Plaintiff's exhibit 7 was not cumulative of other validly admitted testimony because neither side was able to provide any demonstrative evidence of Kendall's ability to consent to sexual conduct or to communicate that consent or lack thereof during the 2003 time period. Accordingly, we conclude that the consideration of plaintiff's exhibit 7 by the jury in the present case was not harmless.

Although we recognize that the trial court was not made aware of the allegation that the jury considered material not in evidence until after judgment was rendered, the trial court abused its discretion in denying the plaintiff's motion to set aside the verdict and for a new trial in light of the jury's improper consideration of a document not in evidence and the probability that the jury was influenced by it. Accordingly, we reverse the trial court's judgment and remand the case to that court with direction to grant the plaintiff's motion to set aside the verdict and for a new trial.

### III

Although our conclusion in part II of this opinion requires that the case be remanded to the trial court for a new trial, we also address the plaintiff's claim that the trial court improperly denied the plaintiff's motion to strike and motion in limine seeking to preclude the defendant from raising the issue of Kendall's consent as an affirmative defense because that issue is likely to arise again on remand. Specifically, the plaintiff asserts that the defendant should not have been allowed to

raise the issue of Kendall's consent as an affirmative defense because, as a conservatee, she did not have the legal capacity to consent.[11] In response, the defendant asserts that the trial court properly denied the plaintiff's motion to strike and motion in limine related to consent. Specifically, the defendant claims that the fact that a person is a conserved person does not, as a matter of law, deprive the person of the legal capacity to consent. Instead, the defendant asserts that whether a person consents is a factual question, even if that person is a conservatee. We agree with the defendant, and, accordingly, conclude that the trial court properly denied the plaintiff's motion to strike and motion in limine related to the issue of consent.

The following additional facts and procedural history are necessary to our resolution of the second issue. In response to the plaintiff's complaint alleging sexual battery, civil assault and intentional infliction of emotional distress, the defendant raised the special defense that "[a]ny and all sexual contact between [the defendant] and [Kendall] was conduct between two capable, willing and consenting adults." Thereafter, the plaintiff filed a motion in limine seeking to preclude the defendant from "raising, directly or indirectly, any claim, assertion, argument, suggestion or inference that the plaintiff's ward, [Kendall], either explicitly or implicitly consented to any of the sexual conduct of the defendant as set forth in the complaint . . . ." The plaintiff also filed a motion to strike, seeking to strike the defendant's special defense that Kendall consented to the sexual conduct alleged. As grounds for her motions, the plaintiff claimed that Kendall was not capable of consenting to sexual conduct because the plaintiff had been appointed the conservator of her person.

The trial court denied both the plaintiff's motion in limine and her second motion to strike. In doing so, the trial court determined that although a Probate Court had found Kendall incompetent to handle certain of her affairs, that did not necessarily mean that she was not able to consent to a sexual relationship with the defendant. Indeed, the trial court pointed to the fact that Kendall was allowed to spend time alone in her own apartment, was able to use the computer, was able to converse with certain people, and engage in basic chores that required decision making, such as shopping and cleaning. The trial court determined that the Probate Court's decision appointing the plaintiff as Kendall's conservator should not deprive the defendant from "inquiring whether [Kendall] had the ability to knowingly and voluntarily enter into the sexual relationship with the defendant and/or continue such conduct and relationship." Instead, the trial court determined that "[t]he jury should, given the facts which will be presented to them at this trial, determine if [Kendall] had the ability to consent." Accordingly, the trial court denied the plaintiff's motion to strike and motion in

limine.

We begin with the well established standard of review regarding motions to strike. "A motion to strike attacks the legal sufficiency of the allegations in a pleading. . . . In reviewing the sufficiency of the allegations in a complaint, courts are to assume the truth of the facts pleaded therein and to determine whether those facts establish a valid cause of action." (Citation omitted.) *Keane* v. *Fischetti*, 300 Conn. 395, 402, 13 A.3d 1089 (2011). "Because a motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court, our review of the court's ruling on [a motion to strike] is plenary." (Internal quotation marks omitted.) *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 252, 990 A.2d 206 (2010).

Furthermore, although the plaintiff's claim does not directly raise a claim of statutory construction, her claim that a conserved person is not able to consent to sexual conduct requires us to interpret the statutory scheme creating conservatorships.[12] "It is well settled that in construing statutes, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . [W]e seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . Finally, we review de novo the trial court's construction of the relevant statutory provisions." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Greco* v. *United Technologies Corp.*, 277 Conn. 337, 347–48, 890 A.2d 1269 (2006).

Under Connecticut's current statutory scheme, two types of conservatorships may be established. A conservator of the estate is appointed to "supervise the financial affairs of a person found to be incapable of managing his or her own affairs" or of a person who voluntarily requests the Probate Court to make such an appointment. General Statutes § 45a-644 (a).[13] A conservator of the person is appointed to "supervise the personal affairs of a person found to be incapable of caring for himself or herself" or of a person who voluntarily requests the Probate Court to make such an appointment. General Statutes § 45a-644 (b).

Section 45a-650 (f)[14] provides in relevant part as follows: "(2) If the court finds by clear and convincing evidence that the respondent is incapable of caring for himself or herself, that the respondent cannot be cared for adequately without the appointment of a conservator and that the appointment of a conservator is *the least restrictive means of intervention available* to assist the respondent in caring for himself or herself, the court may appoint a conservator of his or her person after considering the factors set forth in subsection (g) of this section . . . ." (Emphasis added.)

Section 45a-650 (*l*) provides as follows: "The court shall assign to a conservator appointed under this section only the duties and authority that are *the least restrictive means of intervention* necessary to meet the needs of the conserved person. The court shall find by clear and convincing evidence that such duties and authority restrict the decision-making authority of the conserved person only to the extent necessary to provide for the personal needs or property management of the conserved person. Such personal needs and property management shall be provided in a manner appropriate to the conserved person. The court shall make a finding of the clear and convincing evidence that supports the need for each duty and authority assigned to the conservator." (Emphasis added.) The legislature's repeated use of the term "the least restrictive means possible" to define the duties assigned to the conservator indicates that the legislature intended for a conservatorship to be as limited in scope as possible.

Section 45a-656 (b)[15] proscribes the manner in which a conservator should carry out his or her role as conservator. Specifically, it provides as follows: "In carrying out the duties and authority assigned by the court, the conservator of the person shall exercise such duties and authority in a manner that is the least restrictive means of intervention and shall (1) assist the conserved person in removing obstacles to independence, (2) assist the conserved person in achieving self-reliance, (3) ascertain the conserved person's views, (4) make decisions in conformance with the conserved person's reasonable and informed expressed preferences, (5) make all reasonable efforts to ascertain the health care instructions and other wishes of the conserved person, and (6) make decisions in conformance with (A) the conserved person's expressed health care preferences, including health care instructions and other wishes, if any, described in section 19a-580e, or validly executed health care instructions described in section 19a-580g, or (B) a health care decision of a health care representative described in subsection (b) of section 19a-580e, except under a circumstance set forth in subsection (b) of section 19a-580e. The conservator shall afford the conserved person the opportunity to participate meaningfully in decision-making in accordance with the conserved person's abilities and shall delegate to the conserved person reasonable responsibility for decisions affecting such conserved person's well-being." General Statutes § 45a-656 (b).

Furthermore, the legislature has defined " '[l]east restrictive means of intervention' " as "intervention for a conserved person that is sufficient to provide, within the resources available to the conserved person either from the conserved person's own estate or from private or public assistance, for a conserved person's personal needs or property management while affording the con-

served person the greatest amount of independence and self-determination." General Statutes § 45a-644 (k). Reading these statutes together demonstrates that the legislature intended not only for a conservatorship to be as limited in scope as possible, but also that the conservatorship be carried out so as to maintain the most independence and self-determination for the conserved person. Indeed, § 45a-650 (k) explicitly provides that "[a] conserved person shall retain all rights and authority not expressly assigned to the conservator." On the basis of the foregoing statutory scheme, which demonstrates that the legislature intended for conservatorships not only to be limited in scope but also not to unnecessarily restrict the independence of the person under the conservatorship, we conclude that the statutory scheme supports the conclusion that a conserved person has the ability to consent to sexual conduct.

Indeed, it has previously been noted that, "[e]ven more importantly, the overarching principle defining the contours of the relationship between the court, the conservator and the conserved person is the duty to safeguard the best interests of the conserved person." *Gross* v. *Rell*, 304 Conn. 234, 40 A.3d 240 (2012) (*McLachlan, J.*, concurring and dissenting). This court has previously recognized that "there is no difference in the court's duty to safeguard the interests of a minor and the interests of a conserved person . . . [and that] [t]he purpose of statutes relating to guardianship is to safeguard the rights and interests of minors and [adult incapable] persons, and it is the responsibility of the courts to be vigilant in seeing that the rights of such persons are properly protected . . . . This is reflected in the statutory scheme governing conservatorships, which requires the Probate Court to be guided by the conserved person's best interests in establishing the conservatorship and selecting the conservator . . . ." (Citations omitted; internal quotation marks omitted.) *Lesnewski* v. *Redvers*, 276 Conn. 526, 540, 886 A.2d 1207 (2005).

In examining the current statutory scheme for conservatorships, it is important to understand the historical context in which this scheme developed. "Prior to 1998, in all cases in which a court found that a respondent was incapable, it was obligatory to appoint a plenary conservator. While amendments in Connecticut law later permitted appointment of a conservator on a limited basis, and permitted courts to decline to intervene in situations in which there was already a less restrictive means in place to manage the respondent's needs, plenary appointments continued to be the norm."[16] K. McEvoy, 20 Connecticut Practice Series: Connecticut Elder Law (2012–2013 Ed.), §13:10, p. 775.

"This has changed due to the comprehensive amendments that were made in the 2006 legislative session. The amendments reflect years of debate on the national

scene concerning standards and procedure for appointment of a guardian. . . . These recommendations have inspired reform in many states, and have had a significant influence on the drafting of model legislation." Id., pp. 775–76.

In 1994, the Commission on National Probate Standards issued a revised set of standards that focused on the following requirements, inter alia: "[1] greater emphasis on the individual's functional limitations; [2] consideration of less restrictive alternatives; [3] use of prehearing court visitors to discuss with respondents the potential for deprivation of rights, and to investigate assertions made petitions; [4] the role of counsel as advocate for the respondent . . . [5] due process protections including personal notice, expedient hearings, and strengthened evidentiary standards; and [6] a presumption of limited, evidence-based, individually-tailored appointments." Id., p. 776.

This individual centered approach was also the focus in 1997, when the National Conference of Commissioners on Uniform State Laws revised the Uniform Guardianship and Protective Proceedings Act to reflect that guardians should be: appointed only when necessary; only for so long as necessary; and only with such powers as are necessary. Id.

In 2002 and 2004, the American Bar Association Commission on Law and Aging convened experts in the field to discuss means including education, research and funding, by which reforms on guardianship could be achieved. Id. This group developed "a detailed 'map' of action steps for areas including interstate jurisdiction, training and standards of court practice, presumption of limited guardianship and monitoring standards." Id., p. 777.

In the 2006–2007 legislative session, the Connecticut legislature made significant amendments to the statutory scheme governing conservatorships. Specifically, pursuant to No. 07-116 of the 2007 Public Acts, the court could limit the powers and duties given to a conservator but needed to make specific findings to justify any limitation. See also General Statutes (Rev. to 2007) § 45a-650 (h). The amendment required that the court limit the duties of the conservator to only the duties and authority that are the least restrictive intervention necessary to meet the person's needs and that the management be provided in an appropriate manner. Public Act 07-116, § 16. The statutory amendments also required the court to find by clear and convincing evidence that the duties and authority restrict the person's decision making only to the extent necessary to provide for personal needs or property management and make a finding of the clear and convincing evidence that supports the need for each duty and authority. This act also added the provision that specifies that the person retains all rights and authority not expressly given to

the conservator. Public Act 07-116, § 16.

In describing Public Act 07-116, the Office of Legislative Research stated as follows: "Among the bill's most important changes, it: 1. requires the [P]robate [C]ourt to record proceedings on appointing conservators, setting their powers and duties, and terminating conservatorships; 2. requires appeals of hearings appointing a conservator to be on record and sets the standard for court review; 3. changes the definitions of incapacity, which is required for the court to find appointment of a conservator necessary; 4. includes specific language for a notice to the person who is the subject of a petition for appointment of a conservator; 5. adds specific provisions about the right to an attorney and to choose an attorney, for a person who has a conservator appointed for him or her or is the subject of a petition for the appointment of one; 6. requires the [P]robate [C]ourt to consider certain factors and changes the standard the court must apply before deciding to appoint a conservator, including requiring a finding that appointing the conservator is the least restrictive intervention available to assist the person; 7. requires the [P]robate [C]ourt to give a conservator only the least restrictive duties and authority necessary to meet the person's needs, and the court must make specific findings on the need for each duty or authority; 8. requires a conservator to carry out the duties and authority assigned by the court in a manner that is the 'least restrictive means of intervention' . . . 9. makes a number of similar changes to provisions on appointing a temporary conservator; 10. imposes specific requirements on the conservator of the person, including assisting in removing obstacles to the conserved person's independence, ascertaining the person's views, and making decisions that conform with the person's reasonable and informed preferences; 11. creates a procedure for the [P]robate [C]ourt to hold a hearing on changing a conserved person's residence similar to the provisions in current law for a conservator placing a person in a long-term care institution; and 12. allows a conserved person to petition the [P]robate [C]ourt to terminate the conservatorship at any time." Office of Legislative Research, Bill Analysis Substitute Senate Bill 1439, "An Act Concerning Conservators and Appeals of Conservatorships and Guardianships" (2007) available at http://www.cga.ct.gov/2007/BA/2007SB-01439-R01-BA.htm (last visited May 23, 2014). " 'Although the comments of the [O]ffice of [L]egislative [R]esearch are not, in and of themselves, evidence of legislative intent, they properly may bear on the legislature's knowledge of interpretive problems that could arise from a bill.' *Harpaz* v. *Laidlaw Transit, Inc.*, 286 Conn. 102, 124 n.15, 942 A.2d 396 (2008); cf. *State* v. *Tabone*, 279 Conn. 527, 542, 902 A.2d 1058 (2006) (consulting analysis of bill by [O]ffice of [L]egislative [R]esearch to ascertain legislative intent)." *State* v. *Courchesne*, 296 Conn. 622, 700, 998 A.2d 1 (2010); *Butts*

v. *Bysiewicz*, 298 Conn. 665, 688 n.22, 5 A.3d 932 (2010) (same).

During debate in the House on the bill, Representative Gerald Fox, a sponsor of the bill explained the following: "[It] essentially is a comprehensive [overhaul] of our laws regarding conservatorships. It is the product of a tremendous amount of work by a [c]ommittee that was chaired by Hartford Judge [Robert] Killian, including law professors, [health-care] professionals, legal aid and legal rights groups. And they all came together to form a compromise that is the product that we have before us here this afternoon. The goals of this [c]ommittee were twofold. They were to ensure that the highest two due process safeguards are in place before a [P]robate [C]ourt interferes with an individual's civil rights by forming a conservatorship." 50 H.R. Proc., Pt. 16, 2007 Sess., pp. 5150–51.

Representative Fox further explained that the new requirements put in place "also clearly establish that the conservatorship is a last resort, and that it is the least intrusive means available by which the individual's affairs can be handled. . . . And only if the [c]ourt finds by clear and convincing evidence that the respondent, the person being conserved cannot manage their own affairs, and they find that the appointment is that least restrictive means available, than only then will a conservator be appointed." Id., pp. 5151–52.

The current statutory scheme governing conservatorships and its historical development make it abundantly clear that the legislature intends for conserved persons to retain as much decision-making authority and independence as possible, and that a conservator's role should be limited so as to accomplish that objective. Indeed, the fact that a conservator is appointed does not mean that the conserved person loses all of his or her civil rights. Rather, the conservator is to manage the conserved person's affairs through the least restrictive means possible. With that in mind, we turn to the plaintiff's claim in the present case. The crux of the plaintiff's claim is that it was improper for the trial court to allow the defendant to present evidence that Kendall consented to the sexual conduct between her and the defendant on the ground that Kendall was legally unable to consent because she was a conserved person. As we have explained previously herein, a conservatorship is to be narrowly tailored to meet its objectives, a conservator only has the authority specifically assigned to him or her and any other decision-making authority remains in the conserved person. On the basis of the statutory scheme for conservatorships, we cannot conclude that any conserved person is legally unable to consent to sexual conduct. Instead, we conclude that the issue of whether a conserved person is able to consent to sexual conduct is a factual question for the jury to decide based on the nature of the particular conservatorship

and the abilities of the conserved person.

In the present case, the plaintiff did not establish, or even allege, that her appointment as conservator of Kendall's person specifically included the duty to manage Kendall's interpersonal and/or romantic relationships. Indeed, as the trial court recognized, the evidence demonstrated that Kendall lived in her own apartment, spent unsupervised time there, and was able to make decisions about her household chores and carry on interpersonal relationships, including those on the computer. Instead, the plaintiff maintains that the fact that Kendall was a conserved person was sufficient by itself to demonstrate that she was unable to consent to sexual conduct. We disagree. A bright line rule on this issue, as suggested by the plaintiff, would be contrary to the clear legislative intent as exemplified by the statutory scheme. It would further affect the civil liberties of all conserved persons. Therefore, we conclude that the final determination of whether Kendall had the ability to consent to sexual conduct is a factual question that the jury must decide.

Accordingly, we cannot conclude that the trial court improperly denied the plaintiff's motion to strike and motion in limine regarding consent. To the contrary, we agree with the trial court that the defendant was entitled to inquire into Kendall's ability to consent to sexual conduct and to raise her consent as a defense to the claims made by the plaintiff.

IV

Although our conclusion in part II of this opinion requires that the case be remanded to the trial court for a new trial, we also address the defendant's claim[17] that the trial court improperly instructed the jury to consider Kendall's conservatorship in determining her capacity to consent to sexual conduct because it is likely to arise again on remand. The defendant asserts that the trial court should not have instructed the jury to consider the fact that Kendall was a conserved person because being a conserved person does not constitute a bar from consent.

We first set forth the standard of review applicable to a challenge to a jury instruction. "When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as

improper." (Internal quotation marks omitted.) *Archambault* v. *Soneco/Northeastern, Inc.*, 287 Conn. 20, 42, 946 A.2d 839 (2008).

In the present case, the trial court instructed the jury as follows on the issue of consent: "As to the issue of whether [Kendall] consented, you must determine, based upon the testimony and the evidence, whether the plaintiff has proved that [Kendall] did not consent.

"As to the special defense of consent alleged by the defendant, he has the burden of proof on this special defense by a fair preponderance of the evidence to prove that he is not liable for the damages alleged because [Kendall] had the capacity and did consent.

"Based upon the claims by each party, you then must determine if consent was or was not given. Consent is an expression or a willingness for something to occur. It implies voluntariness, free will; reasoned or intelligent choice; physical or moral power of acting in an act of concurrence unclouded by fraud, distress or mistake. It may be manifested by words, by actions or by inaction, and to avoid liability, it must be legally valid.

"For your purposes, any person is presumed by law to be capable of consenting to sexual conduct unless such person is barred by law. For instance, such as the age of the person or the degree of kinship between the parties or . . . unless the other person knows or has reason to know of some mental or psychological abnormality, whether temporary or permanent, which would impair the ability to consent and render that consent invalid.

"In this regard, the [plaintiff] contends that [Kendall] was not capable of giving consent as I have defined it because of the appointment of a conservator. She further contends that even without considering the appointment, the testimony and evidence demonstrate at the time in question between February, 2003, and August, 2003, [Kendall] was not capable of consent because she did not understand and appreciate the nature of the sexual act, its character or the probable consequences which are part of the act.

"Further, you must determine that she did not voluntarily, freely and knowingly enter into the relationship. The ability to give knowing consent involves more than a person's I.Q. or cognitive ability.

"It is a question of fact for you to determine based upon the totality of the testimony and evidence whether the plaintiff and the defendant has sustained their burden as to this element of consent. In making a finding, you may consider the following: Number 1, was [Kendall] legally capable of consenting to the relationship because she has a conservator appointed by the Probate Court. Number 2, was [Kendall] mentally capable, that is voluntarily, knowingly and freely consenting to the relationship which includes the scope of the sexual

relationship between her and the defendant. And [number] 3, did [Kendall] demonstrate by her words, by her conduct or by her inaction that she either consented or did not consent to each of the sexual acts.

"As to the capability to consent, you have heard testimony and received evidence that in 1994, the Probate Court in Stamford appointed [the plaintiff] as a conservator for [Kendall]. This appointment was made pursuant to our law to give authority to the [plaintiff] to consent to [Kendall's] medical or other professional care, counsel, treatment or service. This appointment is a factor that you may consider in determining whether [Kendall] consented to the sexual relationship.

"This appointment of conservator without more is not necessarily conclusive proof of the capability of [Kendall] to consent to the sexual relationship."

As we explained in part III of this opinion, the fact that Kendall was a conserved person at the time of her relationship with the defendant is not determinative of whether she had the capacity to consent. Instead, the final determination of whether Kendall had the ability to consent to sexual conduct is a factual question that the jury must decide based on all of the evidence, including the fact that she was a conserved person. Reviewing the challenged jury instruction in the present case, in its entirety and read as a whole, we cannot conclude that it was improper. The challenged instruction explained the factual considerations that are relevant to a determination of whether Kendall consented, including the fact that she was a conserved person at the time of her relationship with the defendant. On the basis of our conclusion in part III of this opinion, we conclude that the instruction was proper.

V

We also address the defendant's claim that the trial court improperly submitted interrogatories asking the jury to determine whether the defendant showed Kendall pornographic photographs and videos because it is likely to arise again on remand.

"In *Freedman* v. *New York, N.H. & H. R. Co.*, 81 Conn. 601, [612] 71 A. 901 (1909), this court observed . . . that the purpose of interrogatories was to elicit a determination of material facts, [and] to furnish the means of testing the correctness of the verdict rendered, and of ascertaining its extent. *Gaulton* v. *Reno Paint & Wallpaper Co.*, 177 Conn. 121, 125, 412 A.2d 311 (1979); see also *Blanchette* v. *Barrett*, 229 Conn. 256, 262–63 n.6, 640 A.2d 74 (1994) (interrogatories [provide] a means by which the jury [could] record the findings of fact [that] form[ed] the basis for their verdict . . . . The power of the trial court to submit proper interrogatories to the jury, to be answered when returning their verdict, does not depend upon the consent of the parties or the authority of statute law. In

the absence of any mandatory enactment, it is within the reasonable discretion of the presiding judge to require or to refuse to require the jury to answer pertinent interrogatories, as the proper administration of justice may require. *Freedman* v. *New York, N.H. & H. R. Co.*, [supra, 612]. . . . The trial court has broad discretion to regulate the manner in which interrogatories are presented to the jury, as well as their form and content." (Citation omitted; internal quotation marks omitted.) *Viera* v. *Cohen*, 283 Conn. 412, 449–50, 927 A.2d 843 (2007).

In the present case, the trial court's interrogatories included three questions asking the jury to determine whether the plaintiff had proved by a preponderance of the evidence that the defendant "repeatedly showed Kendall pornographic [photographs] and videos." These interrogatories were part of the interrogatories related to claims of sexual battery, civil assault and intentional infliction of emotional distress. There was evidence presented at trial to form a basis for these interrogatories. Indeed, the plaintiff claimed that the defendant showed Kendall pornographic photographs and videos as part of his scheme to overpower and take advantage of her. Accordingly, we conclude that it was within the trial court's discretion to submit interrogatories to the jury on this issue.

VI

The defendant also raised other claims in his brief that we decline to review because they were inadequately briefed. "We are not obligated to consider issues that are not adequately briefed." *West Haven* v. *Norback*, 263 Conn. 155, 177, 819 A.2d 235 (2003). "Whe[n] an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived." *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 115, 653 A.2d 782 (1995). In addition, mere conclusory assertions regarding a claim, with no mention of relevant authority and minimal or no citations from the record, will not suffice. See *Celentano* v. *Rocque*, 282 Conn. 645, 659, 923 A.2d 709 (2007); *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 272 Conn. 14, 44 n.20, 861 A.2d 473 (2004); *West Haven* v. *Norback*, supra, 177; see also Practice Book § 67-4.

First, the defendant claims that the trial court improperly denied the defendant's motion to dismiss various counts of the plaintiff's complaint at the close of the plaintiff's evidence because the plaintiff's expert witness was conclusory and misstated the requisite level of competence. The defendant only offers two short paragraphs with no analysis, no citations to the record or transcripts to direct this court to the trial court's discussion of the defendant's motion to dismiss[18] at the close of the plaintiff's evidence. The only legal citations provided relate to the standard of review for directed

verdicts. Accordingly, we consider this claim inadequately briefed and do not review it.

The defendant also claims that the trial court improperly instructed the jury to consider certain statutory exceptions to the defense of consent for persons in positions of authority. The defendant addresses this claim in less than one page of his brief, provides no citations to the record, only a citation to General Statutes § 53a-73a,[19] and provides no analysis of the claim. Therefore, we consider this claim inadequately briefed and do not review it.

The judgment is reversed and the case is remanded for a new trial.

In this opinion ROGERS, C. J., and NORCOTT and ZARELLA, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] Kortner instituted the present civil action against the defendant in her capacity as the conservator of Kendall's person. After trial, Kendall died and Kortner was appointed as administratrix of Kendall's estate. Thereafter, the trial court granted a motion substituting Kortner, in her capacity as administratrix, as the plaintiff in the present case. For the sake of simplicity, we refer to Kortner, in her capacity as both conservator and administratrix, as the plaintiff throughout this opinion.

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[3] The defendant filed a cross appeal from the judgment of the trial court to the Appellate Court; see footnote 4 of this opinion; and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[4] The defendant cross appealed from the judgment of the trial court claiming that the trial court improperly: (1) denied his motion to dismiss various counts of the plaintiff's complaint at the close of the plaintiff's evidence because the plaintiff's expert witness was conclusory and misstated the requisite level of competence; (2) instructed the jury to consider (a) Kendall's conservatorship in determining her capacity to consent to sexual conduct and (b) certain statutory exceptions to the defense of consent for persons in positions of authority; and (3) submitted interrogatories to the jury to determine whether the defendant showed Kendall pornographic photographs and videos where it was asserted that the viewing of such materials by adults is neither illegal nor tortious. We note, however, that the defendant was not aggrieved by the judgment of the trial court and, therefore, lacked standing to file an appeal. See *State* v. *T.D.*, 286 Conn. 353, 358–59, 944 A.2d 288 (2008). Accordingly, as stated previously in this opinion, we consider these issues only to the extent that they are likely to arise again on retrial and are adequately briefed.

[5] The plaintiff was last reappointed as conservator of Kendall's person in October, 2009.

[6] See footnotes 2 and 3 of this opinion.

[7] Following oral argument, we ordered the parties, sua sponte, to submit simultaneous briefs on the following issues: "1. When the Probate Court has ordered a conservatorship of the person only and has not expressly granted authority to the conservator to sue on behalf of the conserved person, does the conservator have standing to commence an action in the conservator's own name in her capacity as conservator for intentional torts against the conserved person by a third party? 2. If not, can such a subject matter jurisdictional defect be cured by the trial court's decision granting the conservator's motion to substitute herself in her capacity as administratrix of the conserved person's estate following the death of the conserved person [postjudgment]?" Because we conclude that, even if the plaintiff lacked standing to bring this action in 2006, any defect was cured by her substitution as administratrix of Kendall's estate, we do not reach the first question.

[8] After hearing argument on the motion to set aside the verdict and for a new trial, the trial court requested that both counsel submit memoranda

as to whether a further evidentiary hearing was necessary to determine what effect, if any, the inclusion of plaintiff's exhibit 7 had on the jury. Both parties submitted memoranda to the court in which they argued that the court should not conduct an evidentiary hearing into the allegations regarding the jury considering material not in evidence.

[9] Assuming, arguendo, that the actions of the plaintiff's counsel constituted a waiver regarding plaintiff's exhibit 7, the clerk's failure to inform the trial court of the jurors' concerns about the exhibit trumps the waiver by the plaintiff's counsel. If the court had been made aware of the problem and properly informed the parties about it, the court would have abused its discretion if it failed to remove the exhibit from the jury's consideration and instructed them accordingly. This is particularly true in light of the fact that, during oral argument, counsel for the defendant conceded that he would not have objected to that course of action.

[10] Justice McDonald asserts in part II B of his concurring and dissenting opinion that "there is no evidence that remotely would suggest that the jury did consider, or would have considered, [plaintiff's] exhibit 7 in its deliberations." We disagree. The record demonstrates that plaintiff's exhibit 7 was considered by the jury. The jury reviewed the exhibit, drafted a question for the judge about the exhibit, spoke with the trial court clerk about it, and even showed it to the trial court when she spoke to the jurors after the verdict. The mere number of times that the jury attempted to inquire about the exhibit is evidence of the impact the exhibit had on the jury.

Justice McDonald further asserts that plaintiff's exhibit 7 "lends some support to the plaintiff's case and is consistent with Kendall's own testimony." We disagree. In the affidavits, the jury foreperson explained as follows: "The jury was confused, and some members were troubled, about why this letter was a plaintiff's exhibit and why it was in the box of exhibits sent in to us, but based on the clerk's comments, we assumed that the exhibit was properly before us and that we were supposed to see it even without any previous explanation." Another juror explained in his affidavit as follows: "In spite of all this, I was never able to understand why [exhibit 7] was a *plaintiff's* exhibit and why it had been given to us but never discussed or explained by anyone during the trial." (Emphasis in original.) The jury's own confusion over why the exhibit was offered by the plaintiff belies Justice McDonald's assertion that the letter was actually consistent with the plaintiff's case.

Furthermore, a careful review of the letter demonstrates that it was not consistent with the plaintiff's case. First, as we have explained previously in this opinion, the plaintiff's case was premised on the fact that Kendall lacked the capacity to consent to sexual conduct. As Justice McDonald acknowledges, "evidence that a person has expressed that he or she does not consent to engage in certain conduct would be relevant evidence of that person's capacity to consent." Therefore, a letter in which Kendall expressed her lack of consent to engage in sexual conduct with one individual was not consistent with the plaintiff's case, but directly in opposition to it.

Second, plaintiff's exhibit 7 actually bolstered the credibility of the defendant. The defendant's entire defense was premised on the fact that Kendall was able to consent to sexual conduct and had, in fact, consented to all sexual conduct between them. Therefore, a letter, which appeared to have been written by Kendall expressing her lack of consent to engage in sexual conduct with another individual at the same time she was beginning a sexual relationship with the defendant supported his claim that Kendall had the capacity to consent to sexual conduct and that, if Kendall did not consent to the sexual conduct with the defendant, she would have expressed her lack of consent in the same way she expressed her lack of consent to sexual conduct by Jones.

Third, plaintiff's exhibit 7 damages the credibility of Kendall. Plaintiff's exhibit 7 is dated February, 2003, and states that "one of your employees . . . for the past two years has consistently made unwanted, inappropriate and threatening sexual advances to me." In February, 2003, Kendall had just recently moved back into her apartment after the stroke that occurred in 2001. The testimony at trial, including the plaintiff and Kendall's own testimony established that Kendall was not living in her apartment between May, 2001 and late November, 2002. Instead, she had been staying in a hospital, a rehabilitation facility, and at the plaintiff's house during that period. Accordingly, a letter in which she accused an employee of her apartment complex of consistently engaging in unwanted, inappropriate and threatening sexual advances during a time period when he would have been unable to engage in such conduct, because she was under supervised care, would damage her credibility with the jurors because the jurors would see the inconsistency between that accusation and the other testimony presented.

Moreover, prior to trial, the plaintiff had filed a motion in limine seeking the court to prohibit "the defendant from inquiring into, making any reference to, or offering any exhibits relating to" Jones and two other individuals whom she had alleged engaged in inappropriate sexual advances. The basis of the plaintiff's motion was that references to these prior accusations of sexual advances were more prejudicial than probative and would be used by the defendant in an attempt to show that Kendall accused every man she met of engaging in sexual misconduct. After hearing argument on the motion in limine, the trial court ruled that the defendant was not to inquire into the prior complaints without first alerting the court of his intention to do so, but reserved its decision on the admissibility of such evidence to be made based upon the testimony at the time of trial. During trial, the trial court ultimately ruled on the motion and determined that "[t]here will be no questions regarding this individual named [Jones]." The trial court's ruling on the plaintiff's motion in limine demonstrates that it had determined that references or exhibits related to the plaintiff's allegations regarding Jones would be prejudicial to the plaintiff. Accordingly, we conclude that the improper consideration of plaintiff's exhibit 7 likely "affected the jury's perception of the remaining evidence." *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 292 Conn. 163.

Justice McDonald seems to suggest that the testimony of the experts, and not Kendall's credibility, was a paramount factor in the jury's determination as to whether Kendall had the capacity to consent. We disagree. Justice McDonald's concurring and dissenting opinion is substituting a particular view of how a jury should have considered the evidence in the present case rather than acknowledging the fact that, in a case of this nature, Kendall's testimony and credibility was the key element of the case and an exhibit that called any of her testimony into question would have swayed the jury.

[11] The plaintiff also asserts that the defendant's defense of consent should have been barred because, as a matter of public policy, an individual should not be allowed to consent to the nature of the sexual conduct alleged in the present case. The plaintiff did not provide and we cannot find any support for the proposition that, as a matter of law, consent is not a defense to a civil action because of the types of sexual acts alleged. As we explain more fully herein, whether the defendant and Kendall engaged in the sexual conduct alleged by the plaintiff and whether Kendall consented to that sexual conduct was properly a question of fact for the jury to determine.

[12] As we explain subsequently in this opinion, the legislature has made significant changes to the statutes governing conservatorships since the events underlying the present appeal. See, e.g., Public Acts 2007, No. 07-116, § 16. We note that, to the extent that we examine the question of legislative intent in this opinion, we refer to the current revision of General Statutes §§ 45a-644, 45a-650 and 45a-656.

[13] See footnote 12 of this opinion.

[14] See footnote 12 of this opinion.

[15] See footnote 12 of this opinion.

[16] In 1998, the legislature enacted No. 98-219, § 17, of the 1998 Public Acts, which allowed the court to limit the powers of a conservator upon a specific finding that such limitation was in the best interests of the conserved person.

[17] The defendant referred to this claim as an issue on cross appeal. The defendant was not aggrieved by the judgment of the trial court and, therefore, cannot appeal. See footnote 4 of this opinion. Nevertheless, we address those claims that "should be considered on appeal in the event the appellant is awarded a new trial . . . ." Practice Book § 63-4 (a) (1) (B).

[18] Indeed, the plaintiff asserts that the defendant never moved for dismissal at the close of the plaintiff's evidence.

[19] This court notes that there is no mention of § 53a-73a in the court's charge in the present case.